IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 1:24-CR-110 |
| v. | Hon. Rossie D. Alston |
| ROBERT THEODORE SANFORD, JR. | Sentencing: Sep. 18, 2024 |
| *Defendant*. | |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

*On my honor, I will never betray my badge, my integrity, my character or the public trust. I will always have the courage to hold myself and others accountable for our actions. I will always uphold the Constitution and the community I serve.*

Law Enforcement Oath of Honor, Fairfax County Sheriff's Office Standards of Conduct.

Former deputy sheriff Robert Sanford Jr. violated his sworn duties by distributing fentanyl and other drugs within the Fairfax County Adult Detention Center and elsewhere in exchange for money and sex. In doing so, Sanford placed the lives of inmates, his law enforcement peers, and vulnerable women in danger; exploited victims of the opioid epidemic entrusted to his care; threatened the security of the community, and diminished confidence in law enforcement and the criminal justice system. Sanford's betrayal of his badge and abuse of public trust demands a meaningful term of imprisonment.

For the reasons set forth herein, the United States respectfully submits that a sentence of imprisonment within the advisory guidelines range is sufficient but not greater than necessary in this case.

1

**BACKGROUND**

Sanford was employed by the Fairfax County Sheriff's Office ("FCSO") as a deputy sheriff. He worked night shifts at the Fairfax County Adult Detention Center ("Fairfax ADC") where his primary duties included supervising inmates and ensuring a safe, secure prison operation. Presentence Investigation Report ("PSR") (ECF No. 41) ¶ 17. When asked in his application process why he would like to be employed at FCSO, Sanford wrote:

> It's always been a passion of mine to work and give back to the community, and to lead by example. I always thought to myself, that I can be a role model for kids and young adults that look like me in the community, and let them know that doing the right thing is ok and you still can be yourself. But my ultimate goal is to show the youth and young adults that right is right no matter. It may be hard to do at times, but right is right no matter what.

Robert Sanford Jr. FCSO Application (emphasis in original).

Within a year of taking his law enforcement oath, Sanford was smuggling drugs into Fairfax ADC. Within 14 months of the oath, the defendant was housing and advertising sex workers out of an apartment he rented for their use.

One of the defendant's main partners in the offenses of conviction, Javonte Smallwood, was an inmate at Fairfax ADC with a lengthy criminal record, including convictions for robberies and assault with a dangerous weapon. Sanford and Smallwood quickly developed a relationship after meeting at Fairfax ADC, and in December 2022 together worked to smuggle a contraband phone to ease the communication between the two of them. Then for months the two worked together to smuggle in distribution quantities of fentanyl, cocaine, and suboxone.  PSR ¶ 23, 24.

2

Sanford generally obtained the contraband from associates of inmate Smallwood, and then smuggled the contraband into Fairfax ADC using his unscrutinized access as an official within the prison. Sanford typically received between $400 and $600 to smuggle contraband into the facility, and he received the payments from inmate Smallwood's associates via Cash App, a mobile application that allows users to transfer money to one another. PSR ¶ 27, 49, 50, 53, 54. The contraband that Sanford smuggled into Fairfax ADC included fentanyl, cocaine, a contraband phone, and Suboxone, which is a pharmaceutical used to treat addiction (medically referred to as opioid use disorder). PSR ¶ 24. Sanford smuggled contraband into Fairfax ADC for inmate Smallwood on at least five occasions between December 2022 and May 2023.

Because the smuggling scheme operated within a detention center—an area under constant law enforcement surveillance—the success of the operation depended on the defendant's efforts to undermine his employer's investigative efforts. The defendant ensured the continued success of his smuggling by two means: (1) coercing potential "snitches" through intimidation and violence to request cell reassignment away from the conspiratorial hub; and (2) planning conspiratorial activities to occur at times and in locations that the defendant knew other members of FCSO would not be watching. PSR ¶¶ 32-38.

For example, the defendant utilized his access to FCSO databases to identify inmates who were cooperating with law enforcement. The defendant would then share information with inmate Smallwood, who on multiple occasions agreed to threaten or use violence to intimidate witnesses into silence. For example, on one occasion the defendant warned inmate Smallwood that a particular inmate within Smallwood's block (housing unit) was "hot" because he had "dry snitched on one of the deputies." PSR ¶ 37. Smallwood understood the defendant's implicit

3

directive, responding "Say no more im on him…Ima get on his ass. He about to get the fuck up outta here." Later that same day, the defendant asked to be kept updated, adding "I want him down in the zoo or hole," and "he will fuck up a whole operation." PSR ¶ 37.

With respect to FCSO investigative activities, from the onset of the smuggling scheme, the defendant routinely disclosed to inmate Smallwood sensitive law enforcement information regarding crime detection efforts within the jail. The defendant told inmate Smallwood early in the scheme "Blitz is the code for SD [shakedown]. If I send it to you know it's coming your way."[1] Thereafter, the defendant routinely warned inmate Smallwood of upcoming searches and advised him on how to best hide their drug distribution from deputies—warning inmate Smallwood when drug-sniffing dogs were being employed at Fairfax ADC and strategizing together where to hide drugs and other contraband. PSR ¶ 34.

The defendant's drug distribution scheme with Smallwood extended outside the Fairfax ADC walls. In particular, the defendant and Smallwood conspired to distribute drugs to sex workers who the defendant used to further enrich himself with money and sex. PSR ¶¶ 28, 56-61. Beginning in February 2023, the defendant rented an apartment in Baltimore, Maryland through which he housed and trafficked women for his own profit. PSR ¶ 57. The defendant obtained this apartment with one particular woman, "Nikki," who lived and prostituted herself out of the apartment. The defendant was the only individual named on the lease because "Nikki" had a pending warrant for her arrest. The defendant at times bragged about his sex-trafficking venture with inmate Smallwood, stating "I gotta efficiency out of bmore I rented for this joint she getting

---

[1] Several text messages are quoted and referenced herein that are not contained within the Presentence Investigation Report. All have been previously provided to the defendant in discovery months ago. The government will further have the complete message strings referenced herein available for the Court's review at sentencing.

money payin a [expletive] well," and adding that "she run bitches…I can make a mil easy." PSR ¶ 57. In furtherance of his drug trafficking scheme, the defendant sourced cocaine through inmate Smallwood to distribute to Nikki, later thanking Smallwood because "that shit going to make me $$$ I need them going like the energizer bunny." PSR ¶ 29. The defendant also recruited others to be trafficked out of the apartment. For example, on May 4, 2023, when a woman contacted the defendant asking for a place to stay while she experienced homelessness, the defendant offered for her to stay at the apartment and to post advertisements for her sex work online—including for paid encounters for two sex workers at the same time. The defendant added, "team work make the dream work." PSR p. 25. When this woman told the defendant she was not only homeless but also opioid dependent, the defendant assured her that an associate came by the apartment daily and "it's cool you will make money and have maintenance [for her drug addiction] tonight." The defendant then directed Nikki via text message to allow the woman to stay at the apartment, to help her make money, and get her drugs. This encounter occurred while the defendant was employed by FCSO.

Fortunately, it was at this time when evidence appears to show a peak in the defendant's criminal activity, that law enforcement uncovered and began building evidence against the defendant. Because on this same date that the defendant coerced a homeless, opiate-addicted woman to prostitute herself for him, FCSO discovered contraband introduced by the defendant on inmate Smallwood's person. PSR ¶ 40. Smallwood was found with a contraband iPhone, 92 counterfeit pills laced with fentanyl, 174 strips of Suboxone, and over three grams of cocaine during a strip search of Smallwood. PSR ¶ 40.

The defendant found out about law enforcement's developing investigation into his activities the following day, May 5, 2024, and immediately took steps to destroy evidence and conceal his involvement in the scheme. Sanford deleted text messages of his conspiratorial activities, removed his email address from association with the CashApp account he used to receive bribes, changed his phone number, and nearly immediately began steps to resign from FCSO under the false pretense that he and his wife agreed the employment would not meet their childcare needs. PSR ¶¶ 42, 43. In reality, evidence shows the defendant lied to his wife and pretended that he continued to work at FCSO until around December 2023, many months later. PSR ¶ 74.

Though the defendant beginning in May 2023 took steps to conceal his scheme with Smallwood, he did not cut his criminal ties when given this opportunity to turn over a new leaf. He maintained his leased apartment in Baltimore for nearly a year, until March 2024. And as further set forth in the PSR, distribution of drugs in furtherance of sex trafficking continued well after his resignation from FCSO. Text messages specifically evidencing the defendant coordinating "gangbangs" and "pimp[ing]" a woman out for money. PSR ¶ 59. The cellular telephone seized from the defendant at the time of arrest is replete with electronic communications, photographs, and video materials evidencing these encounters.

After the defendant resigned from FCSO under false pretenses, he continued to seek out jobs in law enforcement and within at least one other detention center. In early 2024, Sanford ultimately obtained another job in law enforcement as a police officer. PSR ¶ 123. In an interview for a public internet profile of Sanford in relation to that new job, he described the

6

need to communicate effectively in communities that have a negative perception of police and overcome the "stereotype that all police officers are bad."

On April 22, 2024, the defendant was charged via a criminal complaint with conspiring to distribute fentanyl, cocaine, and suboxone. The defendant was arrested the following day. To the defendant's credit, he quickly agreed to plead guilty. The defendant should receive some consideration from the court for this saving the government and the court time and resources in preparing for trial. However, this quick acceptance of responsibility is undermined by the defendant's utterly incredible statements to law enforcement thereafter, for example by claiming that he was motivated to smuggle drugs by a desire to lessen inmate disruption and build evidence against inmate Smallwood to report to his supervisors. PSR ¶ 72.

## SENTENCING ANALYSIS

### I.      Law

The Court consults both the Sentencing Guidelines and the sentencing factors in 18 U.S.C. § 3553(a) to determine a defendant's appropriate sentence.  Although the Sentencing Guidelines are advisory, district courts are required to "consult those Guidelines and take them into account when sentencing."  *United States v. Booker*, 543 U.S. 220, 264 (2005).  Under the required procedures, a "district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines.  Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence."  *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

Section 3553(a) requires district courts to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Paragraph 2 lists four purposes for a sentence: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).  In addition to the purposes of sentencing listed in Section 3553(a)(2), a sentencing court must also consider: (1) the nature of the offense and the defendant's history and characteristics; (2) the kinds of sentences legally available; (3) the advisory sentencing range provided by the Sentencing Guidelines; (4) any relevant policy statement issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities; and (6) the need for restitution.  18 U.S.C. § 3553(a).

## II.    Guidelines Calculation

The United States has reviewed the Presentence Investigation Report (ECF No. 41) and agrees with the base offense level and application of the enhancements that were assessed by the Probation Officer.  PSR ¶¶ 83–86, 88–89.  The parties have agreed, and the Probation Officer has found, that the Chapter Two offense level is the minimum offense level of 26, as required for an offender who introduces controlled substances into a prison under U.S.S.G ¶ 2P1.2(c)(1). PSR ¶ 4, 90. The parties further agreed to, and the Probation Officer has assessed, a two-level increase under U.S.S.G. § 3B1.3 for "Abuse of Position of Trust or Use of Special Skill."  PSR ¶¶ 4, 88. The United States does not agree with the Probation Officer's determination that the vulnerable victim enhancement under U.S.S.G. § 3A1.1. is inapplicable because the 2D1.1 specific offense

characteristic for distribution within a prison incorporates the vulnerabilities of the individuals who were targeted and exploited by means of the defendant's conduct. *See* PSR p. 26. Further, the government defers to the Court on an assessment of the defendant's acceptance of responsibility given the evidence of obstruction. If the Court finds that the defendant qualifies for a two-level decrease in the offense level pursuant to U.S.S.G. § 3E1.1(a), the government will move for an additional one-level decrease at the time of sentencing.

With respect to the two counts of the Criminal Information, the Probation Officer has appropriately grouped the counts together under § 3D1.2(c). *See also* U.S.S.G. §2P1.2, App. Note. 3 (same).

Should the Court accept the Probation Office's calculation, the final advisory Guideline range would be 70-87 months, based on a final offense level of 27 and Criminal History Category of I, and removing one additional offense level point for acceptance of responsibility.

### a.   *The Vulnerable Victim Enhancement Applies*

The Probation Officer has declined to apply the two-level enhancement for vulnerable victims under U.S.S.G. § 3A1.1 because one factor that made some of the defendant's victims vulnerable—their status as inmates—is incorporated into the offense guidelines under the specific offense characteristic for distribution within a prison. PSR p. 26. The government respectfully disagrees. The vulnerable victim is applicable in this case due to his exploitation of Fairfax ADC inmates and sex workers.

### i.   *The Legal Standard*

U.S.S.G. § 3A1.1 provides for a two-level enhancement where the defendant knew, or should have known, that a victim of the offense was a vulnerable victim. The Commission provides that "vulnerable victim" means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct. The Fourth Circuit has held that there is a two-part test to determine whether the vulnerable victim enhancement should apply. *See United States v. Llamas*, 599 F.3d 381, 388 (4th Cir. 2010). "First, a sentencing court must determine that a victim was unusually vulnerable. Second, the court must then assess whether the defendant knew or should have known of such unusual vulnerability." *Id.* (internal citations omitted).

The Guidelines definition of a vulnerable victim is broader in several ways than the confines of what individuals may be considered a victim for purposes of restitution. For example, a vulnerable victim can be victimized by any relevant conduct, not just the offense of conviction. *United States v. Bolden*, 325 F.3d 471, 500 (4th Cir. 2003). Further, there is no requirement of a showing of a proximate harm to the victim to apply the vulnerable victim enhancement under the guidelines. *United States v. Adeolu*, 836 F.3d 330, 331 (3d Cir. 2016). When an offense has multiple victims of relevant conduct, the government need only prove that one victim was unusually vulnerable. *See United States v. Llamas*, 599 F.3d 381, 387 (4th Cir.2010).

The Fourth Circuit has on several occasions affirmed the application of the vulnerable victim enhancement to defendants convicted of drug crimes where there is no identifiable statutory victim, but nevertheless the defendant victimized someone who is unusually vulnerable. *See United States v. Amedeo*, 370 F.3d 1305, 1317–18 (11th Cir. 2004) (distribution of cocaine to a

10

person under 21); *see also United States v. Volkman*, 797 F.3d 377, 398 (6th Cir. 2015) (applying enhancement to a doctor convicted of unlawful drug distribution); *United States v. Singh*, 54 F.3d 1182, 1191-93 (4th Cir. 1995) (doctor convicted of distributing controlled substances outside scope of medical practice); *United States v. Milstein*, 401 F.3d 53, 74 (2d Cir. 2005) (distribution of misbranded prescription drugs).

       i.   *Sex Worker Victim(s)*

It is clear that at least one female, unusually vulnerable by means of homelessness and opioid addiction, was victimized by the defendant's drug trafficking. *See* Discussion on Page 4, *supra*. It is unquestionable that Sanford's distribution to sex workers is relevant conduct to his drug conspiracy conviction, as it is agreed to in the statement of facts. SOF ¶ 14. It is further clear, that the defendant knew that the acquaintance who asked him for housing assistance on May 4, 2023, was unusually vulnerable due to her homelessness and opioid addiction—both facts were explicitly discussed between them.  Even "Nikki," the primary resident of the Baltimore apartment, was targeted due to vulnerability because her husband was incarcerated, and she had a pending arrest warrant. These women were down on their luck. They didn't have stable homes. And that gave the defendant an area to exploit for his own pleasure and financial gain.

Courts have similarly affirmed the application of the vulnerable victim enhancement where the defendant knew of and exploited the poverty, drug use, and homelessness of those that they provided drugs to and sexually trafficked. *See United States v. Royal*, 442 F. App'x 794, 798 (4th Cir. 2011) (defendant exploited drug dependence vulnerability, homelessness, and lack of contact with family to sexually exploit victims of drug and sex-trafficking offenses); *United States v. Irving*, 554 F.3d 64 (2d Cir. 2009) (homelessness and lack of parental supervision); *United States*

*v. Jimenez-Calderon*, 183 F. App'x 274 (3d Cir. 2006) (victims who "were young, uneducated, naive and from extremely impoverished families")*;United States v. Guidry*, 817 F.3d 997, 1008 (7th Cir. 2016). In *Royal*, the Fourth Circuit noted that in "continu[ing] to provide drugs and alcohol…[the defendant] took advantage of each victim's drug dependence vulnerability." *Royal*, 442 F. App'x at 798. *See also  United States v. Evans*, 272 F.3d 1069, 1091 (8th Cir.2001) (victim vulnerable to sex trafficking because defendant knew she was drug-addicted and provided her drugs). Further, as is also true in this case, the defendant further maintained a means to exert control over the vulnerability of the victim by housing her with co-conspirators. *Id.* The enhancement has been affirmed on this basis even where the offense of conviction is not specifically sexual exploitation. *United States v. Amedeo*, 370 F.3d 1305, 1317 (11th Cir. 2004) (affirming finding that victim's drug addiction rendered him unusually vulnerable to the defendant supplying him cocaine); *United States v. Pavao*, 948 F.2d 74, 78 (1st Cir. 1991) (affirming finding that victim's drug addiction rendered her unusually vulnerable to defendant convicted of impersonating a federal drug agent, who did so in order to obtain money and services from the victim through fraud).

Accordingly, the vulnerable victim enhancement is a proper on this basis alone, and the vulnerability of these sex worker victims is not otherwise incorporated in the offense guideline. With respect to these victims, the Probation Office has indicated that they defer to the Court on the application of the enhancement. PSR p. 26.

If, however, the vulnerable victim enhancement is not found by means of defendant Sanford's exploitation and trafficking of women in relation to his drug trafficking, an upward departure may be appropriate pursuant to U.S.S.G. § 5K2.8 based on the fact that the defendant

committed the offenses of conviction in order to facilitate the commission of another offense—namely, the sexual trafficking of women. This aspect of the defendant's scheme not only reflects a horrendous aspect of the defendant's crimes but is also conduct not otherwise taken into account by the Guidelines for his drug trafficking and drug conspiracy counts of conviction.

ii.   *Inmate Victims*

Inmates under Sanford's care were victimized in at least two ways in relation to the charged offense. First, Sanford and Smallwood arranged for violence and threats towards prison inmates. PSR ¶¶ 37, 38, 85. Second, Sanford victimized the inmates entrusted to his care who were supposed to receive Medication-Assisted Treatment ("MAT") for substance use disorder, but who instead were provided deadly fentanyl by the defendant's scheme.

As it relates to inmate victims, numerous circuit courts have confirmed the application of the vulnerable victim enhancement to prison detainees who are victimized due to the vulnerability of their detention status. See*, e.g.*, *United States v. Hershkowitz*, 968 F.2d 1503 (2d Cir. 1992) (detainee assault by INS detention enforcement officer); *United States v. Pierre*, 870 F.3d 845, 850 (8th Cir. 2017) (detainees whose identities were stolen in course of mail fraud scheme).

For example, in *United States v. Tapia*, the United States Court of Appeals for the Eleventh Circuit reviewed the district court's decision that an incarcerated government informant, whom other prisoners assaulted, was a vulnerable victim for U.S.S.G. § 3A1.1's purposes. *See* 59 F.3d at 1143. The Eleventh Circuit concluded that there was no error in the application of the enhancement to the appellants' convictions under 18 U.S.C. § 1513 (retaliating against a witness, victim, or informant), determining that the district court "correctly concluded that [the victim], as an

13

individual, was particularly vulnerable by virtue of his incarceration with Appellants and his inability to escape, and that [the victim] was targeted because of this vulnerability." 59 F.3d at 1143.

Similarly, in *United States v. Lambright*, the Fifth Circuit upheld a § 3A1.1 enhancement where a corrections officer killed an inmate. *See* 320 F.3d at 518. The district court concluded that the inmate was a vulnerable victim, because "he was completely dependent upon the care of the correction officers, ... was locked in his cell prior to the assault, and ... he could not protect himself from the assault." 320 F.3d at 518.

Here, the defendant and Smallwood targeted various inmates because of their perceived, or even potential for, cooperation with law enforcement. These inmates were completely dependent on the defendant and other officers at Fairfax ADC for care, including the confidentiality of information regarding cooperation with law enforcement. Instead of performing his duties, the defendant targeted inmates due to this vulnerability.

Further, the defendant exploited opioid-addicted inmates for his financial gain. These inmates were particularly vulnerable because, again, they were entrusted to the care of the defendant *and* treatment of the facility. Prison is one of few places that those who have hit rock bottom may be able to rid themselves of addiction, particularly at detention centers like Fairfax ADC that utilize Medication Assisted Treatment ("MAT"). By introducing one of the most addictive and deadliest drugs in history into the detention center, the defendant robbed these vulnerable inmates of the treatment they deserved. A vulnerable victim enhancement is appropriate under these circumstances, just as it is in cases against medical prescribers. *See Volkman*, 797 F.3d

14

377 (6th Cir. 2015); *Singh*, 54 F.3d 1182 (4th Cir. 1995); *United States v. Milstein*, 401 F.3d 53, 74 (2d Cir. 2005).

With respect to inmate victims, the Probation Office declined to apply the enhancement, citing to Application Note 2 (paragraph 3), which instructs:

> Do not apply subsection (b) if the factor that makes the person a vulnerable victim is incorporated in the offense guideline. For example, if the offense guideline provides an enhancement for the age of the victim, this subsection would not be applied unless the victim was unusually vulnerable for reasons unrelated to age.\

USSG § 3A1.1, Application Note 2.

With respect to the opioid-addicted inmates, their vulnerability due to addiction is *not* incorporated into the offense guideline, and as stated above, the enhancement has been affirmed based on exploitation of addicts in drug distribution cases.

With respect to the inmates who were physically assaulted, it may be a closer question as to whether the "distribution within a prison" enhancement under 2D1.1 incorporates the vulnerability of institutional victims. The Fourth Circuit has not addressed the contours of this application note aside from the specific example provided therein of age-based vulnerabilities. *See United States v. Dowell*, 771 F.3d 162, 171 (4th Cir. 2014); *United States v. Grubbs*, 585 F.3d 793, 805 (4th Cir. 2009). Nevertheless, the government submits that cooperating inmates exploited by the defendant represent a class unusually vulnerable in a way that is not taken into account by the enhancement applicable to distribution of controlled substances within a prison. These inmates were particularly vulnerable due to the extreme risk to their safety posed by their cooperation with law enforcement while living within a prison full of criminals. And the defendant and Smallwood targeted them with threats of and actual violence to ensure the continued operation of their drug

15

distribution scheme. These vulnerabilities of the "snitches" that the defendant targeted are simply not incorporated into the drug offense guideline.

### b.  Acceptance of Responsibility

The defendant argues and probation has assessed that despite his obstructive conduct, he merits a three-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(a) and (b). Because this determination involves a complex assessment, some of which may be best assessed at the time of sentencing, the government deters to the Court on whether this provision applies.

Application note 3 to USSG § 3E1.1 provides,

> Entry of a plea of guilty prior to the commencement of trial **combined** with truthfully admitting the conduct comprising the offense of conviction, **and** truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable under § 1B1.3 (Relevant Conduct) . . . will constitute significant evidence of acceptance of responsibility for the purposes of subsection (a). However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right.

USSG § 3E1.1, application note 3 (emphasis added).

USSG § 3E1.1 application note 4 addresses acceptance of responsibility where a defendant has engaged in the obstruction of justice:

> Conduct resulting in an enhancement under § 3C1.1 (Obstruction or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be **extraordinary** cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply.

USSG § 3E1.1 application note 4. (emphasis added).

16

The defendant is not automatically entitled to the two-point reduction for acceptance of responsibility because he entered a guilty plea prior to indictment. Further consideration should be made where a defendant has failed to truthfully admit relevant conduct. The defendant's persistence in continuing to offer innocent explanations for his conduct to investigators surrounding the entry of his plea—namely that his motivation in distributing drugs was to quell drug addicts within the prison and that he fully intended to report his and Smallwood's scheme to prison deputies—are indicative a lack of acceptance of responsibility. PSR ¶¶ 72–76.

The Probation Officer correctly noted that the defendant's obstructive conduct occurred prior to the entry of his plea of guilty before the Court, and that he was cooperative with the Probation Office during the presentence investigation. However, the fact that obstructionist conduct occurs prior to indictment or to the entry of a guilty plea does not make the conduct any less obstructive. Automatically awarding acceptance of responsibility in such a case ignores the line of cases, including *United States v. McLaughlin*, 378 F.3d 35 (1st Cir. 2004), that disagrees with the premise that there is a "per se temporal rule that debars a sentencing court from examining any pre-plea behavior in the course of gauging the genuineness of an accused's acceptance of responsibility. *McLuaghlin*, 378 F.3d at 39. In doing so the *McLaughlin* court commented that "courts regularly consider a defendant's favorable pre-plea conduct in granting downward adjustments for acceptance of responsibility…Most streets run two ways." *McLaughlin*, 378 F.3d at 40.

Numerous other cases have applied similar reasoning. *See United States v. Keys*, 359 Fed. Appx. 585, 588 (6th Cir. 2009) (involving a defendant who falsely denied relevant conduct); *United States v. Michener*, 352 Fed. Appx. 104, 106 (7th Cir. 2009)(rejecting a defendant's claim that a reduction for acceptance is warranted where the obstructive conduct is prior to the arrest and

17

the cooperation is post-arrest, as "a defendant who obstructed justice cannot 'wipe the slate clean, and earn the acceptance of responsibility discount, just by pleading guilty and thereafter refraining from obstructing justice further.'")(quoting *United States v. Buckley*, 192 F.3d 708, 711 (7th Cir. 1999)).

Nevertheless, the government recognizes the defendant quickly acknowledged guilt once charged, obviating the need to spend additional law enforcement and prosecutorial resources, and this should appropriately receive consideration as to what sentence to impose.

## III.     Section 3553(a) Analysis

### a.  History and Characteristics of the Defendant

The defendant is a 37-year-old man from Washington, DC who, to his credit, worked his way up various trades, including years as a bus driver, to a career in law enforcement. The defendant further has no criminal convictions. Prior to his arrest, the defendant had a stable job, a house, a wife with a federal government career, and a young child. By external appearances, the defendant lived a successful, law-abiding life.

The foregoing makes clear that the defendant's crime was not borne out of a troubled upbringing, the limitation that may attend a lack of education, desperate financial circumstances, or a substance abuse struggle. He did not need to distribute drugs. It is frankly perplexing in this case what motivated the defendant to live the multiple lives that it appears he engaged in throughout the scheme.

There are many aspects of the defendant's conduct that do not fit within the mold put forward by the defense as an individual who suddenly and temporarily diverted from a law-abiding

18

life due to various "stressors" of the kind that many young parents encounter, yet who do not themselves turn to drug and sex trafficking for a prolonged period. *See* ECF 43 and Exhibit C.

During the course of the defendant's crimes, at nights, the defendant worked his law enforcement job. When off hours, he appeared to have split his time between his life as a husband and a father, and a wholly separate life as a pimp, engaging nearly daily in the solicitation and trafficking of sex workers, at times fueled by drugs that the defendant procured.

There is a significant distinction between one who merely solicits escorts or uses drugs to relieve stress and escape, and one who provides housing and drugs to opioid-dependent and homeless women in exchange for sexual acts and financial gain while lying to them about his employment and family status. The defendant's criminal transgressions were numerous, varied, and extremely serious.

b.  *Nature, Circumstances, and Seriousness of Offense*

The nature and circumstances of Sanford's conduct require a serious and meaningful punishment. Unfortunately, like many others, this district has not been immune to corruption within our government and specifically, within our prison system. This district regularly sees cases involving misconduct by employees at correctional institutions, but this case is among the most serious. To undersigned counsel's knowledge and from review of case data, this is the first case within this district where a law enforcement officer has been convicted of smuggling fentanyl into a correctional institution. The profound devastation that fentanyl continues to cause in our community is unprecedented. And the risk of overdose is heightened within a correctional institution where inmates typically do not have access to fentanyl and, were they a prior user, have

19

typically lost their tolerances. The offense was extremely dangerous to the Fairfax ADC population.

Perhaps more astonishing, and what goes beyond many other prison corruption cases, is the defendant's blatant disregard for the safety of other inmates and absolute betrayal of his law enforcement peers. The defendant did not simply receive bribes to look the other way. It is one thing to introduce drugs into a prison. It is a whole new category of offense to do so while surreptitiously disseminating law enforcement's movements, activities, and cooperator information. In the outside world, drug distribution frequently comes with violence. Already faced with serious security risks due to the placing of violent and non-law-abiding criminals all under one roof, adding illegal drugs and frequent leaks of law enforcement investigative efforts certainly heightens the likelihood of violence and other problems. Sanford placed his colleagues and inmates in grave danger. The lengths to which he went to compromise the safety of staff and inmates at Fairfax ADC appears unprecedented.

    c.   *The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct (18 U.S.C. § 3553(a)(2)(B))*

A considerable sentence in this case appropriately accounts for the need to deter both the defendant and other prison officials who may be inclined to profit from their positions of public trust.

First, as to specific deterrence, it is abundantly clear that observing life in a detention center on a regular basis did not deter the defendant from committing crimes. Not only did the defendant observe the isolation that a prison sentence carries, but he also encountered individuals plagued by addiction and other negative consequences of the drug trade. It was therefore with a unique

20

knowledge of the consequences of his actions that the defendant chose to commit crimes. This was no one-off criminal episode or temporary lapse in judgment. His operation required substantial deliberation and a whole series of decisions on an almost daily basis to abuse the trust placed in him as a representative of the Fairfax County Sherriff's office. Sanford smuggled in contraband on at least five occasions within the span of just six months, and routinely violated the law in other ways through his drug and sex trafficking outside Fairfax ADC. It is abundantly clear that the threat of societal harm, prosecution, and detention in this case had absolutely no deterrent effect on the defendant. A considerable sentence must be imposed to capture the defendant's attention and to deter him from continuing his criminal lifestyle.

But more than deterring the defendant, the Court's sentence must also send a message of general deterrence: corruption in law enforcement will not be tolerated. Using a position of trust, particularly one within the criminal justice system, for personal enrichment should be harshly punished and condemned. Without adequate deterrence, public corruption will continue, and the public's distrust will grow. Though there certainly may be numerous opportunities for corrections officers to misstep in interacting with convicted felons on a regular basis, Sanford could have easily blown the whistle and reported Smallwood's solicitation, or simply walked away when asked to smuggle in contraband. Instead, Sanford repeatedly accepted bribes. The sentence in this case should be sufficiently serious to deter public officials from putting self-interest and greed above loyalty to the law and safety of others. It also should send a message that the job of a corrections officer is one that requires integrity and fidelity to the oath one takes; it is not a job to be sought or accepted with the expectation that it can be used for illicit financial gain.

21

A meaningful term of incarceration is required to promote respect for our anti-corruption and drug laws and to restore faith in our law enforcement agencies. As put by one court, "[w]hen a corrupt office holder receives too lenient a sentence, the public understandably loses confidence in the integrity of its system of government." *United States v. Sorenson*, 233 F. Supp. 3d 690, 699 (S.D. Iowa), *aff'd*, 705 F. App'x 481 (8th Cir. 2017).

    d.    <u>*The Need to Avoid Unwarranted Sentencing Disparities*</u>

The guidelines in this case take into account many aspects of the breadth of the criminal conduct and the defendant's lack of criminal history. Indicating a clear directive that corrupt law enforcement officers who smuggle any controlled substances require significant sentences, the Sentencing Commission has set a *floor* offense level of 26 in these cases. Due to the relatively low quantities of drugs attributable to the single seizure in the case, the guidelines range in this case falls not far above that floor. Sentencing the defendant within the advisory guideline range will ensure that there is no unwarranted disparity between the defendant's sentence and others who violate the public trust to introduce deadly drugs into our correctional systems.

[CONTINUED ON NEXT PAGE]

## CONCLUSION

Given the defendant's conduct in this case, based on the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes by the defendant, the United States submits that a guidelines sentence is sufficient but not greater than necessary to satisfy the sentencing factors in Section 3553(a).

Respectfully submitted,

Jessica D. Aber
United States Attorney


_____/s/_____
Heather D. Call
Assistant United States Attorneys

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 11th day of September 2024, I filed the foregoing electronically with the Office of the Clerk of Court using the CM/ECF system, which will automatically send a notification of such filing to all counsel of record.

 

 

_____/s/_____

Heather D. Call

Assistant United States Attorney